1  JILL M. MANNING (Bar No. 178849)
     jmanning@pwfirm.com
2  **PEARSON WARSHAW, LLP**
3  555 Montgomery St., Suite 1205
   San Francisco, California 94111
4  Telephone: (415) 433-9000

5  DANIEL L. WARSHAW (Bar No. 185365)
     dwarshaw@pwfirm.com
6  BOBBY POUYA (Bar No. 245527)
     bpouya@pwfirm.com
7  NAVEED ABAIE (Bar No. 323338)
     nabaie@pwfirm.com
8  ERIC J. MONT (Bar No. 319592)
     emont@pwfirm.com
9
10 **PEARSON WARSHAW, LLP**
   15165 Ventura Boulevard, Suite 400
11 Sherman Oaks, California 91403
   Telephone: (818) 788-8300
12
   Attorneys for Plaintiff and the Proposed Class
13                **UNITED STATES DISTRICT COURT**

14            **EASTERN DISTRICT OF CALIFORNIA**

15                  **SACRAMENTO DIVISION**

16 | Willsim Latham, LLC, Individually and on Behalf | CASE NO. |

17 of All Others Similarly Situated,
                          Plaintiff,         **CLASS ACTION COMPLAINT**
18          v.                                For Violations of:
19 MetroList Services, Inc.; Sacramento Association   (1) The Sherman Act, 15 U.S.C. § 1;
   of Realtors, Inc.; Placer County Association of    (2) The Cartwright Act, California
20 Realtors, Inc.; El Dorado County Association of     Business and Professions Code §§16720
   Realtors; Lodi Association of Realtors; Yolo        *et seq.*;
21 County Association of Realtors; Central Valley      (3) The Unfair Competition Law,
   Association of Realtors; Amador County              California Business and Professions Code
22 Association of Realtors; Nevada County              §§17200 *et seq.*; and
   Association of Realtors, Inc.; Sutter-Yuba          (4) Unjust Enrichment.
23 Association of Realtors, Inc.; RE/MAX Holdings,
   Inc.; Anywhere Real Estate Inc.; Keller Williams
24 Realty, Inc.; eXp World Holdings, Inc.; Norcal      **DEMAND FOR JURY TRIAL**
   Gold Inc.; Century 21 Select Real Estate, Inc.;
25 William L. Lyon & Associates, Inc.; Paul M.
   Zagaris, Inc.; Guide Real Estate, Inc.; and DOES 1
26 through 50, inclusive,
                          Defendants.
27
28

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

1005209.1

Plaintiff Willsim Latham, LLC ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action against the Defendants, and alleges as follows:

## NATURE OF THE LAWSUIT

1. This is a class action brought by Plaintiff on behalf of all persons and entities that listed homes for sale on MetroList Services, Inc. ("MetroList") multiple listing service in the counties of Amador, Butte (except for the northern portion), Colusa, El Dorado, Merced County (except for the eastern portion), Placer (except for the Lake Tahoe Basin), Nevada, Sacramento, San Joaquin, Stanislaus, Sutter, Yolo, and Yuba ("MetroList Counties") and then paid buyer broker commissions in connection with the sales of those homes.

2. Plaintiff alleges that during the four years prior to the filing of this action ("Class Period"), Defendants conspired and continue to conspire to restrain trade by causing Class Members to pay buyer broker fees and inflated commissions on home sales, in violation of Section 1 of the Sherman Act, the Cartwright Act, California Business and Professions Code §§ 16720 *et. seq,* and California's Unfair Competition Law, California Business and Professions Code §§ 17200 *et. seq.* ("UCL"). Plaintiff further alleges that Defendants were unjustly enriched as a direct result of the conduct described herein.

3. Defendants are MetroList Services, Inc., the Realtor Association Defendants (collectively consisting of the Sacramento Association of Realtors, Inc., Placer County Association of Realtors, Inc., El Dorado County Association of Realtors, Lodi Association of Realtors, Yolo County Association of Realtors, Central Valley Association of Realtors, Amador County Association of Realtors, Nevada County Association of Realtors, Inc., and the Sutter-Yuba Association of Realtors, Inc.), and the following real estate "Brokerage Defendants": RE/MAX Holdings, Inc., Anywhere Real Estate Inc., Keller Williams Realty, Inc., eXp World Holdings, Inc., Norcal Gold Inc., Century 21 Select Real Estate, Inc., William L. Lyon & Associates, Inc., Paul M. Zagaris, Inc., and Guide Real Estate, Inc.

4. A multiple listing service ("MLS") is a database of properties listed for sale in a

2

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

particular geographic region and accessible to real estate brokers and their realtors[1] or agents that comply with the rules of the MLS.[2] Brokers that are members of an MLS are required to list all properties for sale on the MLS. MetroList is one such regional MLS, which operates and is available in the MetroList Counties.

5.      The gravamen of Plaintiff's complaint is that Defendants agreed to, implemented, and enforced anti-competitive MetroList rules that require Class Members to make a blanket, unilateral, and effectively non-negotiable offer of buyer broker compensation when listing a property on MetroList.

6.      Unlike most MLSs in the United States, MetroList is not exclusively owned or operated by realtor associations affiliated with the National Association of Realtors ("NAR"); rather, it is owned by local realtor associations, and California Real Estate Brokers, Inc.[3]

7.      Throughout the Class Period, MetroList adopted, implemented, and enforced MetroList Rule 7.13[4] ("Rule 7.13"), which requires all Class member home sellers to make a blanket, unilateral and effectively non-negotiable offer of buyer broker compensation.

8.      Throughout the Class Period, MetroList adopted, implemented, and enforced MetroList Rule 9.5[5] ("Rule 9.5"), which prevents cooperating brokers from attempting to modify the listing broker's offer of compensation.[6]

9.      Access to MetroList is conditioned on members' agreement to adopt and follow all

---

[1] The term "realtor" or "REALTOR®" is both a trademark owned by NAR and a valuable membership benefit that distinguishes members from all others in the real estate business.

[2] *See* National Association of Realtors®, Handbook on Multiple Listing Policy (2023), *available at* https://cdn.nar.realtor/sites/default/files/documents/pdf_mls_handbook-2023-08-11.pdf?_gl=1*1am0u9c*_gcl_au*OTEyNDA1NDUzLjE2OTk5MTA4Nzc ("NAR Handbook").

[3] MetroListPro About Us, *available at* https://www.metrolistpro.com/about; *see also* California Real Estate Brokers, Inc., About, *available at* https://calreb.org/about/

[4] MetroList Services, Inc., Multiple Listing Service, MLS Rules, Rule 7.13 (Effective Jan. 1, 2018), *available at* https://www.sacrealtor.org/documents/members/mls/MLS_Rules_1-1-18.pdf

[5] MetroList Services, Inc., Multiple Listing Service, MLS Rules, Rule 9.5 (Effective Jan. 1, 2018), *available at id*.

[6] MetroList Rules 7.13 and 9.5 are referred to herein as the "Anticompetitive Broker Rules."

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

MetroList rules, including the Anticompetitive Broker Rules.[7]

10.     Defendants' conspiracy forces Class member home sellers to pay a cost that, in a competitive market, would be paid by the buyer. To gain the cooperation of buyer brokers, selling brokers are also incentivized to offer a higher buyer broker commission as part of complying with rules that require all Class Members to make a blanket, unilateral and effectively non-negotiable offer of buyer broker compensation.

11.     In a typical real estate transaction in the MetroList Counties, different real estate brokers will represent the home seller and home buyer. Both the buyer broker and the seller broker are paid a percentage of a home's sales prices. Currently, total broker compensation in the United States is typically, on average, 5% to 6% of the home sales price.[8] Approximately, one half of that amount is paid to the buyer broker.[9] With housing costs in the MetroList Counties sky-rocketing, these broker fees can easily amount to tens of thousands of dollars.[10]

12.     In a competitive market, sellers would pay nothing to buyer brokers, who would instead be paid by the buyers (their clients), and the total commission paid by a seller would be set at a level to compensate only the seller's broker. In a competitive market, buyer brokers would also compete with one another, including by potentially offering a lower commission rate. The anticompetitive rules adopted by MetroList restrain price competition among buyer brokers because the home buyer that retains the buyer broker does not negotiate or pay any commission to his or her broker.

13.     In competitive foreign markets, including the United Kingdom, Germany, Israel,

---

[7] MetroList penalizes and discourages potential noncompliance with its anticompetitive rules, *available at id*.

[8] *See* Anna Bahney, *Why are real estate commissions 6%? – and why that may be changing*, CNN (Dec. 3, 2023), *available at* https://finance.yahoo.com/news/why-real-estate-commissions-6-225830372.html

[9] *Id.*

[10] According to Zillow, the median home price in Sacramento, where Plaintiff sold the home in 2021, is $466,890. https://www.zillow.com/home-values/20288/sacramento-ca/. Thus, the average broker commission on such a sale would be approximately $23,000-$28,000.

Australia, and New Zealand, if home buyers decide to use a broker, they (rather than home sellers) pay that broker less than half the rate paid to buyer brokers in California.

14.     A 2015 report commissioned by the NAR to study negative emerging trends in the real estate industry highlighted concerns that total commissions in the United States are inflated compared to various international markets. According to this report, the average total commissions range between 1% and 3% in countries such as the United Kingdom, Singapore, the Netherlands, Australia, and Belgium.[11]

15.     Many home buyers no longer require the help of a broker to search for prospective homes. Instead, buyers can start their search process by using online services such as Zillow or Redfin and are increasingly retaining a buyer broker after having already found a target home.

16.     Despite the diminishing role of buyer brokers, commissions for buyer brokers have held steady in the 2.5% to 3% range because of conspiracy alleged herein. Furthermore, because housing prices significantly increased during the Class Period, and because commissions are calculated as a percentage of the home's sales price, the actual dollar amounts of buyer commissions substantially increased during the Class Period. Thus, the dollar amount of commissions is increasing at the same time the work done by buyer brokers is decreasing.

17.     Although transaction costs are dramatically decreasing in other sectors and industries that benefit from technological advances, real estate commission rates have persisted generally in the 5% to 6% range. Defendants provide uniform training to seller brokers to maintain such rates and to split commissions roughly equally with buyer brokers. Because these commissions are set via blanket offers agreed to prior to a home being listed, buyer brokers receive the same percentage amount regardless of their efforts, thereby stifling competition.

18.     Because buyer brokers will not show homes to their clients where the seller broker is offering a lower buyer-broker commission or will show such homes later in the search process, seller brokers face pressure in making their unilateral blanket offers to provide high commissions

---

[11] Swanepoel Group, D.A.N.G.E.R Report, at 22 (definitive analysis of negative game changers emerging in real estate) (2015). The report also suggests that total commissions in Germany range between 3% and 6%.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

to buyer brokers.

19.     Moreover, in the absence of Defendants' anticompetitive restraints, seller brokers would likely face additional competitive pressures. Instead of following the long-time practice of setting total commissions at or near 5% to 6%, and assigning roughly half of that amount to themselves and roughly the other half to the buyer broker (and selecting that amount at a level to remain in the good graces of buyer brokers), seller brokers would set a commission to pay themselves alone and would likely begin to engage in more vigorous competition with one another to lower their rates and/or provide additional services to justify their rates.

20.     Another powerful and destructive effect in the marketplace that results from and is amplified by Defendants' anticompetitive conduct is the practice of steering. Given the requirement that seller brokers make a blanket and unilateral offer of commission to buyer brokers, buyer brokers face strong incentives to steer their buyer clients toward homes where the buyer broker would receive a higher commission. Steering is a key reason why agent commissions  remain high in the United States during the internet era, even as commissions in other countries have plummeted. Economic studies and literature document and confirm the prevalence and significance of steering.[12] A recent academic study found systematic and nationwide evidence that buyer agents steer clients away from properties that offer low buyer agent commissions.[13]

21.     Through joining MetroList, each of the Realtor Association Defendants have been involved in the adoption, implementation, and enforcement of the Anticompetitive Broker Rules, including Rules 7.13 and 9.5. Moreover, each of the Realtor Association Defendants are affiliated with NAR, which requires that its members join a local realtor association. The Realtor Association Defendants agreed to enforce the NAR Handbook and the NAR Code of Ethics rules, policies, and practices on its members when they applied to be a new member association of NAR. In fact, the primary objective of the Realtor Association Defendants was "to promote and maintain high

---

[12] *See* Roger P. Alford & Benjamin H. Harris, *Anticompetition in Buying and Selling Homes*, Cato Institute (2021), *available at* www.cato.org/regulation/summer-2021/anticompetition-buying-selling-homes.

[13] *See* Jordan Barry, Will Fried & John William Hatfield, *Et Tu, Agent? Commission-Based Steering in Residential Real Estate* (Oct. 9, 2023), *available at* https://ssrn.com/abstract=4596391.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

1  standards of conduct in the real estate profession as expressed in the Code of Ethics of the N.A.R."

2       22.    The Brokerage Defendants effectuated the conspiracy through their control of the

3  MetroList Board of Directors and the Realtor Association Defendants. The Brokerage Defendants

4  had numerous representatives on the MetroList Board of Directors, the MetroList committees, and

5  the boards and executive teams of the Realtor Association Defendants.

6       23.    The Brokerage Defendants' local franchisees and their agents participate in and

7  implement the conspiracy by serving on the MetroList Board of Directors, MetroList committees,

8  and boards of the Realtor Association Defendants which adopt, implement, and enforce compliance

9  with the Anticompetitive Broker Rules.

10       24.    Each Brokerage Defendant also mandates that its franchisees, brokerages, and

11  individual realtors join NAR and implement NAR's rules to receive the benefit of the Brokerage

12  Defendants' branding, infrastructure, and general support. The Brokerage Defendants' local

13  franchisees and agents located in the MetroList Counties agreed to ensure that MetroList's rules

14  contain the Anticompetitive Broker Rules because of, among other things, employee policy and

15  procedures manuals, the Brokerage Defendants' leadership roles in NAR, and pressure from the

16  Brokerage Defendants.

17       25.    By agreeing to adopt, implement, and enforce the Anticompetitive Broker Rules,

18  the Defendants participated in a conspiracy to restrain trade by requiring Class Members to pay the

19  broker representing the buyer of their homes, and to pay inflated commissions.

20       26.    Defendants' conspiracy inflated buyer broker commissions, which in turn inflated

21  the total commissions paid by Class Members. Plaintiff and Class Members each incurred, on

22  average, thousands of dollars in overcharges and damages due to Defendants' conspiracy.

23       27.    In sum, the conspiracy had and continues to have multiple harmful and

24  anticompetitive effects, including: (a) requiring Class Members to pay for services provided by

25  buyer brokers to the buyer; (b) raising and stabilizing buyer broker compensation at levels higher

26  than they would be in a competitive marketplace; and (c) encouraging and facilitating steering and

27  other actions that impede innovation and entry by new and lower-cost real estate brokerage service

28

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

1005209.1

1  providers.[14]

2  <center>**JURISDICTION AND VENUE**</center>

3  28.     This Court has federal question jurisdiction pursuant to the federal antitrust laws

4  invoked herein, including the Sherman Act and Clayton Antitrust Act, *e.g.*, 28 U.S.C. § 1331, 28

5  U.S.C. § 1337(a), and 15 U.S.C. § 15(a).

6  29.     This Court also has jurisdiction pursuant to the Class Action Fairness Act of 2005,

7  28 U.S.C. §1332(d), because the Class defined herein contains more than 100 persons, the aggregate

8  amount in controversy exceeds $5,000,000, and at least one member of the Class is a citizen of a

9  state different from Defendants.

10  30.     Venue is proper under 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of

11  the events giving rise to the claims occurred in this District.

12  31.     Assignment to the Sacramento Division of this district is appropriate under Civil

13  Local Rule 3-2(d).

14  <center>**PARTIES**</center>

15  A.     **Plaintiff**

16  32.     Plaintiff Willsim Latham, LLC is headquartered in Sacramento, California. Plaintiff

17  sold a home located in Sacramento, California, in 2021, which was listed for sale on MetroList.

18  Upon closing the sale of the home, Plaintiff paid a $18,000 commission to the listing agent (2% of

19  the sale price) and a $22,500 commission to the buyer agent (2.5% of the sale price), for a total of

20  $40,500.

21  33.     As set forth in this Complaint, Defendants' unlawful conduct and conspiracy caused

22  Plaintiff to pay a buyer-broker commission and artificially increased the amount of the total

23  commission to a rate higher than it would have been in a competitive market.

24  / / /

25

26  _____

27  [14] This lucrative broker commission system is currently facing antitrust scrutiny by the Antitrust Division of the United States Department of Justice. *See* Jordan Yadoo and Leah Nylen, *Real Estate Brokers Pocketing Up to 6% in Fees Draw Antitrust Scrutiny*, Bloomberg (2023), *available at*

28  www.bloomberg.com/news/articles/2023-10-16/us-realtors-lucrative-fee-system-faces-mounting-antitrust-risk#xj4y7vzkg.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

B.   **Defendants**

34.      Defendant MetroList Services, Inc. is the second-largest MLS in the State of California. MetroList is headquartered in Sacramento, California and serves the counties of Amador, Butte (except for the northern portion), Colusa, El Dorado, Merced County (except for the eastern portion), Placer (except for the Lake Tahoe Basin), Nevada, Sacramento, San Joaquin, Stanislaus, Sutter, Yolo, and Yuba.[15]

35.      MetroList was founded in 1985 by three Association of REALTORS®: Sacramento, Placer County and El Dorado. As the success of MetroList grew, the following Association of REALTORS® joined to provide a seamless real estate information network: Lodi, Yolo County, Central Valley, Amador County, Nevada County, and Sutter-Yuba.[16] Today, MetroList serves thirteen Northern California counties and is owned by realtor associations, and the California Real Estate Brokers, Inc.[17]

36.      Defendant Sacramento Association of Realtors, Inc. ("SAR") is affiliated with NAR and is a member of MetroList. SAR, founded in 1908, is a nonprofit corporation headquartered in Sacramento, California. The SAR serves over 8,200 REALTOR® Members.

37.      Defendant Placer County Association of Realtors, Inc. ("PCAR") is affiliated with NAR and is a member of MetroList. PCAR is a nonprofit corporation headquartered in Rocklin, California.

38.      Defendant El Dorado County Association of Realtors ("EDCAR") is affiliated with NAR and is a member of MetroList. EDCAR is a nonprofit corporation headquartered in Shingle Springs, California.

39.      Defendant Lodi Association of Realtors ("LAR") is affiliated with NAR and is a member of MetroList. LAR is a nonprofit corporation headquartered in Lodi, California. Since

---

[15] MetroList Services, Inc., Multiple Listing Service, MLS Rules, Rule 7.8 (Effective Jan. 1, 2024), *available at* https://prospector.metrolist.net/documents/mls_rules/mls_rules.pdf

[16] MetroList®, About, *available at* https://prospector.metrolist.net/

[17] MetroListPro About Us, *available at* https://www.metrolistpro.com/about; *see also* California Real Estate Brokers, Inc., About, *available at* https://calreb.org/about/

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

1921, the LAR has served as a service and support organization for more than 2,200 individual REALTORS® and affiliates in the San Joaquin, Stanislaus, and Sacramento Counties.

40.     Defendant Yolo County Association of Realtors ("YOLOCAR") is affiliated with NAR and is a member of MetroList. YOLOCAR is a nonprofit corporation headquartered in Woodland, California.

41.     Defendant Central Valley Association of Realtors ("CVAR") is affiliated with NAR and is a member of MetroList. CVAR is a nonprofit corporation headquartered in Manteca, California.

42.     Defendant Amador County Association of Realtors ("ACAR") is affiliated with NAR and is a member of MetroList. In 2018, ACAR became "a part of the MetroList family," transitioning its MLS operations to MetroList[18] to "provide a seamless real estate information network." ACAR is headquartered in Jackson, California.

43.     Defendant Nevada County Association of Realtors, Inc. ("NCAR") is affiliated with NAR and is a member of MetroList. NCAR is a nonprofit corporation headquartered in Grass Valley, California.

44.     Defendant Sutter-Yuba Association of Realtors, Inc. ("SYAOR") is affiliated with NAR and is a member of MetroList. SYAOR is a nonprofit corporation headquartered in Yuba City, California.

45.     Defendant RE/MAX Holdings, Inc. ("RE/MAX") is one of the nation's largest real estate brokerages. It is headquartered in Denver, Colorado. RE/MAX is publicly traded and has a market value of approximately one billion dollars. It franchises local RE/MAX brokers around the country, which have approximately 6,800 offices and more than 100,000 sales associates. RE/MAX franchises in and transacts substantial business in California, including in this District.

46.     Defendant Anywhere Real Estate Inc., formerly known as Realogy Holdings Corp. ("Anywhere Real Estate") is the nation's largest real estate brokerage company. Headquartered in

---

[18] *MetroList Expands To Amador County*, Council of Multiple Listing Services (Mar. 30, 2018), *available at* https://members.councilofmls.org/news/393416/MetroList-Expands-To-Amador-County.htm.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

Madison, New Jersey, Anywhere Real Estate is a publicly traded corporation with a market value of over $4 billion. It owns, operates, and franchises real estate brokerage firms, including Century 21, Coldwell Banker, Sotheby's International Realty, The Corcoran Group, Better Homes and Garden Real Estate, ZipRealty, ERA Real Estate, Citi Habitats, and Climb Real Estate. Anywhere Real Estate franchises in and transacts substantial business in California, including in this District.

47.     Defendant Keller Williams Realty, Inc. ("Keller Williams") is one of the nation's largest real estate brokerages. Headquartered in Austin, Texas, Keller Williams is a privately held company. It franchises local Keller Williams brokers around the country, which have approximately 700 offices and more than 120,000 sales associates. Keller Williams franchises in and transacts substantial business in California, including in this District.

48.     Defendant eXp World Holdings, Inc. ("eXp") is a publicly traded company incorporated in Delaware with its principal place of business in Bellingham, Washington. eXp offers the bulk of its real estate brokerage services through its subsidiary, eXp Realty, LLC. eXp has residential real estate brokerages in all 50 states. For the year ending December 31, 2022, eXp's agent count exceeded 86,000 and the company provided brokerage services for over 511,000 transactions. eXp franchises in and transacts substantial business in California, including in this District. As used herein, the term "eXp" refers collectively to eXp World Holdings, Inc. and eXp Realty, LLC.

49.     Defendant Norcal Gold Inc. ("RE/MAX Gold") was founded in 1994 with two offices and 40 agents and has grown to over 1,300 agents at 89 locations, serving Northern California and Nevada. RE/MAX Gold is part of Gold Nation, which is the number one RE/MAX franchise in the world, and the number one independently owned real estate company in California. RE/MAX Gold is headquartered in Rancho Cordova, California and transacts substantial business in California, including in this District.

50.     Defendant Century 21 Select Real Estate, Inc. ("Select Group of Real Estate Companies") was founded in 1980 and is now comprised of 7 companies with over 33 offices and 1,200 agents and employees throughout Northern California, Lake Tahoe and Northern Nevada. Select Group of Real Estate Companies is headquartered in Yuba City, California and transacts

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

1  substantial business in California, including in this District.

2      51.    Defendant William L. Lyon & Associates, Inc. ("Lyon Real Estate") has served the

3  Greater Sacramento Region for over seven decades and currently has over 1,000 agents and

4  employees in 17 offices. Lyon Real Estate is headquartered in Sacramento, California and transacts

5  substantial business in California, including in this District. In 2021, Lyon Real Estate was acquired

6  by Windermere Real Estate, a family-run firm, and the largest regional real estate company in the

7  western United States.

8      52.    Defendant Paul M. Zagaris, Inc. ("PMZ Real Estate") is a leading real estate firm in

9  California's Great Central Valley and one of the top 50 real estate brokerages in the United States.

10  PMZ Real Estate has over 500 full-time agents selling over $1.2 billion dollars in real estate every

11  year. PMZ Real Estate is headquartered in Modesto, California and transacts substantial business

12  in California, including in this District.

13      53.    Defendant Guide Real Estate, Inc. ("Guide Real Estate") is a regional brokerage in

14  the Greater Sacramento Area with 6 offices and around 200-250 agents. Guide Real Estate has sold

15  homes valued at $3.5 billion and was awarded Real Trends Nation's Best as a top 1.5% brokerage

16  in the nation. Guide Real Estate is headquartered in Sacramento, California and transacts

17  substantial business in California, including in this District.

18      54.    Doe Defendants 1-50 are members of the conspiracy alleged herein whose identities

19  are presently unknown to Plaintiff. These include, among other entities, other local realtor

20  associations and real estate brokers who agreed to implement the Anticompetitive Broker Rules

21  when listing homes for sale on MetroList. Plaintiff expects that the identity of these Doe Defendants

22  will be revealed during discovery, at which point Plaintiff will seek leave to amend the complaint

23  to add those entities in place of the Doe Defendants.

24      **C.**    **NAR and Unnamed Co-Conspirators**

25      55.    In addition to the named Defendants, NAR participated as a co-conspirator in the

26  conduct alleged in this Complaint.

27      56.    NAR requires its members that own and operate an MLS to comply with the

28  mandatory provisions in the NAR Handbook and Code of Ethics.

57.     NAR requires local realtor associations to monitor their MLSs and its participants to ensure that they comply with the mandatory provisions of the NAR Handbook.

58.     Failure to strictly comply with the Code of Ethics can lead to expulsion from NAR:

> Any Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association.[19]

59.     If a broker or agent was denied access to a local MLS, then that broker and its agents would not be able to list properties for sale in the database or receive offers of compensation for finding a buyer for a listed property.

60.     NAR's model rules for local realtor associations also require adherence to NAR's Code of Ethics.

61.     NAR further penalizes and discourages potential non-compliance with its anticompetitive rules by withholding professional liability insurance from any associations operating under any bylaws or rules that are not approved by NAR.[20] NAR's position and monitoring of potential non-compliance includes conduct to oversee and monitor realtor associations and MLSs.

62.     NAR reviews the governing documents of its local realtor associations to ensure compliance with NAR rules. NAR further requires its local realtor associations to demonstrate their compliance with these rules by periodically sending their governing documents to NAR for review.

63.     In addition to the named Defendants, other local realtor associations and real estate brokers participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof. Specifically, nearly all who own, operate, and participate in MetroList agree to, comply with, and implement the Anticompetitive Broker Rules.

64.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements

---

[19] National Association of Realtors®, Code of Ethics and Arbitration Manual 2019, at 1, *available at* https://www.nar.realtor/sites/default/files/documents/2019-CEAM.pdf.
[20] NAR Handbook, at 8.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

in furtherance thereof.

65.     Defendants are jointly and severally liable for the acts of their co-conspirators, whether or not those co-conspirators are named as Defendants in this Complaint.

## FACTUAL ALLEGATIONS

### I.     Real Estate Industry Background

66.     State licensing laws regulate who can represent buyers and sellers in real estate transactions. There are two categories of licensees: (1) the real estate broker, also known as a "brokerage firm," and (2) the individual real estate licensee or agent. Brokerage firms license individual real estate realtors or agents and are legally responsible for the actions of their licensed realtors or agents.

67.     Licensed brokers are the only entities permitted by state law to be paid for representing buyers or sellers in a real estate transaction. This explains why real estate brokerage contracts with sellers and buyers are required to be with brokers, not agents, and all payments to individual realtors or agents pass through the brokers.

68.     Most brokers and their individual realtors or agents occupy dual roles: a broker may act as a seller broker for some home sales and as a buyer broker for other home sales.

69.     According to NAR, 89% of sellers sold their home with the assistance of a real estate agent in 2023, and 89% of buyers purchased their home with the assistance of a real estate agent or broker in 2023.[21]

70.     In typical residential real estate transactions, real estate brokers and agents receive their compensation through commissions that are calculated as a percentage of a home's sale price, and the commissions are paid when the home is sold.

71.     A seller broker's compensation is set forth in a listing agreement, a contract between the seller and the seller broker. The listing agreement includes the terms of the listing and often provides that the seller broker has the exclusive right to market the seller's home.

---

[21] National Association of Realtors®, Highlights From the Profile of Home Buyers and Sellers (2023), *available at* www.nar.realtor/research-and-statistics/research-reports/highlights-from-the-profile-of-home-buyers-and-sellers

72.     Home buyers retain brokers pursuant to written contracts that typically disclose that the buyer broker will be compensated by receiving a commission from the seller. The seller broker then pays the buyer broker a commission out of the total commission paid by the seller in connection with the home sale.

73.     Like the Anticompetitive Broker Rules, the NAR Handbook and Code of Ethics require residential real estate sellers to make a blanket, unilateral, and effectively non-negotiable offer of compensation to any Buyer's Broker whenever listing a home on any MLS owned or controlled by a local NAR association. If a buyer, represented by a Buyer's Broker, purchases residential real estate, under such a non-negotiable offer of compensation, then the Buyer Broker receives the offered compensation as outlined in the listing agreement. This is described in the NAR Handbook Section 2-G-1 which provides, in relevant part:

> In filing a property with the multiple listing service of an association of Realtors®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants.[22]

74.     The NAR Handbook further states that "[m]ultiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."[23]

75.     The NAR Board of Directors, and the committees reporting to it, determines from time to time whether to modify any policies in the NAR Handbook and has approved certain changes in recent years.

76.     Section 2-G-1 shifts a cost to the seller that would otherwise be paid by the buyer in a competitive market. As *The Wall Street Journal* opined, the result is that home sellers are effectively required to hire a buyer broker if they wish to list their home on an MLS, which requires the services of a seller broker, and that this system is a violation of "the Sherman Anti-Trust [sic]

---

[22] NAR Handbook, at 69.

[23] *Id*., at 40.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

1  Act that keeps buying agents paid though they offer almost no useful services."[24]

2  77.    Moreover, Section 2-G-1's requirement that the seller broker make a blanket,

3  unilateral offer provides an incentive for seller brokers to cooperate with buyer brokers by offering

4  a high commission for the buyer broker. Brokers often act as a selling broker in one transaction

5  but as a buyer broker in another, which further contributes to the anticompetitive effects of the rule

6  in that it fosters an environment in which brokers work cooperatively to split a total commission,

7  instead of openly competing to earn the business of both potential home sellers and potential home

8  buyers based solely on the services to be provided to that represented party.

9  78.    To foreclose the possibility that a buyer might seek to reduce his, her, or their

10  broker's commission by making that reduction a condition of a purchase offer, NAR adopted

11  Standard Practice 16-16:

12  > REALTORS, acting as subagents or buyer/tenant representatives or
13  > brokers, shall not use the terms of an offer to purchase/lease to attempt
   > to modify the listing broker's offer of compensation to subagents or
14  > buyer/tenant representatives or brokers nor make the submission of
   > an executed offer to purchase/lease contingent on the listing broker's
15  > agreement to modify the offer of compensation.[25]

16  In other words, a buyer-broker offer to a seller that is conditional on the seller reducing the buyer-

17  broker commission expressly violates NAR's ethics rules.

18  ## II.   Litigation Concerning NAR's Rules

19  79.    In 2019, a class action was filed against NAR and real estate brokers in the Western

20  District of Missouri alleging that NAR rules violate the Sherman Act by inflating home seller

21  commission rates. *Sitzer v. Nat'l Ass'n of Realtors*, Civil Action No. 4:19-cv-00332 (W.D. Mo.

22  2019). The motion to dismiss that case was denied in October 2020, and the class was certified in

23  April 2022.

24

25  _____

26  [24] Jack Ryan & Jonathan Friedland, *When You Buy or Sell a Home, Realty Bites*, WALL ST. J.
   (Mar. 3, 2019), *available at* www.wsj.com/articles/when-you-buy-or-sell-a-home-realty-bites-
   11551649734.

27  [25] National Association of Realtors®, Code of Ethics and Standard of Practice (Jan. 1, 2023),
   *available at* https://cdn.nar.realtor/sites/default/files/documents/2023-coe-standards-of-practice-

28  2022-12-28.pdf?_gl=1*1lnx2bs*_gcl_au*MTMwMTE3OTY5NC4xNjk5MDc2ODI2

80.     On December 16, 2022, the court denied the motions for summary judgment and trial commenced on October 16, 2023.

81.     Prior to the trial, Defendants Anywhere Real Estate Inc. and RE/MAX Holdings, Inc. reached settlements with Plaintiffs for $83.5 million and $55 million, respectively.

82.     The case proceeded to trial and, on October 31, 2023, a jury found that a conspiracy existed among Defendants NAR, HomeServices of America, BHH Affiliates, HSF Affiliates, Keller Williams Realty, Anywhere Real Estate, and RE/MAX LLC to follow and enforce the NAR's rules, that the conspiracy had the effect of raising, inflating or stabilizing broker commission rates paid by home sellers in violation of the Sherman Act and that the class plaintiffs paid more for real estate brokerage services than they would have absent the conspiracy.

83.     The jury awarded the class plaintiffs over $1.7 billion in damages.

III.    **Defendants Knowingly Participated in the Adoption, Implementation, and Enforcement of the Anticompetitive Rules**

   A.   **MetroList**

84.     Unlike most MLSs in the United States, MetroList is not exclusively owned or operated by realtor associations.[26] MetroList is not a NAR-affiliated MLS and operates according to its own rules.

85.     The Brokerage Defendants or their franchisees, along with their agents and brokers, are members of MetroList. As such, the Brokerage Defendants agreed to adhere to the MetroList rules.

86.     Access to MetroList is conditioned on members' agreement to follow the MetroList rules, including, but not limited to, Rules 7.13 and 9.5.

87.     On January 1, 2018, MetroList adopted the following language of Rule 7.13:

> In filing a property with the MLS, the Broker Participant makes a blanket unilateral contractual offer of compensation to the other MLS Broker Participants for their services in selling the property … A Broker Participant must specify some compensation to be paid and the offer of compensation must be stated in one, or a combination of,

---

[26] MetroListPro About Us, *available at* https://www.metrolistpro.com/about; *see also* California Real Estate Brokers, Inc., About, *available at* https://calreb.org/about/

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

17

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

> the following forms (1) a percentage of the gross selling price; or (2) a definite dollar amount. The amount of compensation offered through the MLS may not contain any provision that varies the amount of compensation offered based on conditions precedent or subsequent or on any performance, activity or event. Furthermore, the MLS reserves the right to remove a listing from the MLS database that does not conform to the requirements of this section.[27]

On March 1, 2022, MetroList amended Rule 7.13, but the aforementioned language remained unchanged.[28]

88.     Rule 7.13 forces Class Members to pay a cost that in a competitive market would instead be paid by the buyer. To gain the cooperation of buyer brokers, selling brokers are also incentivized to offer a higher buyer broker commission as part of complying with Rule 7.13 that requires all home sellers to make a blanket, unilateral and effectively non-negotiable offer of buyer broker compensation.

89.     If Rule 7.13 was not in place, then the cost of buyer broker commissions would be paid by their home buyer clients, and buyer brokers would have to compete with one another by offering a lower commission rate. This anticompetitive rule thereby restrains price competition among buyer brokers because the home buyer, who retains the buyer broker, is unable to negotiate or pay the commission for his or her broker.

90.     On January 1, 2018, MetroList adopted the following language of Rule 9.5:

> The cooperating broker shall not use the terms of an offer to purchase to attempt to modify the listing broker's offer of compensation nor make the submission of an executed offer to purchase contingent on the listing broker's agreement to modify the offer of compensation. However, failure of a cooperating broker to comply with this rule shall not relieve a listing broker of the obligation to submit all offers to the seller as required by Section 9.3.[29]

---

[27] MetroList Services, Inc., Multiple Listing Service, MLS Rules, Rule 7.13 (Effective Jan. 1, 2018), *available at* https://www.sacrealtor.org/documents/members/mls/MLS_Rules_1-1-18.pdf

[28] MetroList Services, Inc., Rule 7.13 (Effective Mar. 1, 2022), *available at* https://irp.cdn-website.com/09417dcc/files/uploaded/MetroList%20Rules%20%28January%26%202021%29%20effective%20March%201.pdf

[29] MetroList Services, Inc., Multiple Listing Service, MLS Rules, Rule 9.5 (Effective Jan. 1, 2018), *available at* https://www.sacrealtor.org/documents/members/mls/MLS_Rules_1-1-18.pdf

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

91.     Upon information and belief, due to concerns regarding the anticompetitive and unlawful effects of the Anticompetitive Broker Rules, MetroList amended Rules 7.13 and 9.5.

92.     On January 1, 2024, MetroList amended Rule 7.13 to state:

> In filing a property with the MLS, any compensation offered will be a blanket unilateral contractual offer of compensation to the other MLS Broker Participants for their services in selling the property … The offer of compensation must be stated in one, or a combination of, the following forms (1) a percentage of the gross selling prices; or (2) a definite dollar amount or zero. The amount of compensation offered through the MLS may not contain any provision that varies the amount of compensation offered based on conditions precedent or subsequent or on any performance, activity or event. Furthermore, the MLS reserves the right to remove a listing from the MLS database that does not conform to the requirements of this section.[30]

93.     On January 1, 2024, MetroList amended Rule 9.5 to state:

> The buyer's agent shall not use the terms of an offer to purchase to attempt to modify the seller's agent offer of compensation nor make the submission of an executed offer to purchase contingent on the seller's agent agreement to modify the offer of compensation. However, failure of a buyer's agent to comply with this rule shall not relieve a seller's agent of the obligation to submit all offers to the seller as required by Section 9.3.[31]

94.     These amendments fail to address or resolve the core anticompetitive effects of Rules 7.13 and 9.5. All versions of the Anticompetitive Broker Rules in effect during the Class Period require blanket, unilateral and effectively non-negotiable offers of compensation to the buyer's agent.

95.     MetroList penalizes and discourages potential noncompliance with its anticompetitive rules.[32]

96.     Accordingly, MetroList, through its Board of Directors and its committees, agreed

---

[30] MetroList Services, Inc., Multiple Listing Service, MLS Rules, Rule 7.13 (Effective Jan. 1, 2024), *available at* https://prospector.metrolist.net/documents/mls_rules/mls_rules.pdf

[31] MetroList Services, Inc., Multiple Listing Service, MLS Rules, Rule 9.5 (Effective Jan. 1, 2024), *available at id*.

[32] MetroList Services, Inc., Multiple Listing Service, MLS Rules (Effective Jan. 1, 2024), *available at id*.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

1   to and did adopt, implement, and enforce the Anticompetitive Broker Rules, including Rules 7.13

2   and 9.5.

3       **B.      Realtor Association Defendants**

4       97.     Each of the Realtor Association Defendants are members of MetroList.

5       98.     The Realtor Association Defendants operated MetroList Administrative Centers

6   that provide a full range of resources and services to MetroList members.

7       99.     As members of MetroList, and by and through their members, the Realtor

8   Association Defendants have been and are involved in the adoption, implementation, and

9   enforcement of the Anticompetitive Broker Rules, including Rules 7.13 and 9.5.

10      100.    The Realtor Association Defendants also are affiliated with NAR, which requires

11  that its members first join a local realtor association.

12      101.    NAR requires that Realtor Association Defendants fully comply with the NAR

13  Handbook and the NAR Code of Ethics. Furthermore, NAR periodically reviews the governing

14  documents of Realtor Association Defendants to demonstrate their compliance with these rules.

15      102.    The Realtor Association Defendants agreed to follow and enforce the NAR

16  Handbook and the NAR Code of Ethics' rules, policies, and practices on its members when they

17  applied to be a new member Association of NAR. The Realtor Associations perpetuated the

18  conspiracy by requiring their members to comply with the Code of Ethics as a condition to

19  membership.

20      103.    Additionally, the Realtor Association Defendants actively participated in the

21  conspiracy through its enforcement of the Code of Ethics by disciplinary proceedings and

22  mandatory education.

23      104.    Throughout the Class Period, nearly all MetroList Board members, committee

24  members, and broker owners were also members of NAR and the Realtor Association Defendants.

25      105.    Through their membership in both NAR and the Realtor Association Defendants,

26  the MetroList Board of Directors and committee members agreed to adopt and enforce the Code of

27  Ethics as a condition to membership. Accordingly, the Realtor Association Defendants participated

28  in the adoption, implementation, and enforcement of the Anticompetitive Broker Rules.

C.    **The Brokerage Defendants**

106.    As a condition to membership, the Brokerage Defendants agreed to adopt, implement, and enforce the Anticompetitive Broker Rules when they became members of MetroList.

107.    The local franchisees and agents of the Brokerage Defendants participate in and implement the conspiracy by serving on the MetroList board and its committees, which adopt, implement, and enforce compliance with Anticompetitive Broker Rules.

108.    Additionally, the Brokerage Defendants effectuated the conspiracy through its control of the Board of Directors and officers of the Realtor Association Defendants. The Brokerage Defendants had numerous representatives on the Board of Directors and executive team for the Realtor Association Defendants. They were instrumental in adopting and enforcing the Anticompetitive Broker Rules.

109.    Consequently, each of the Brokerage Defendants received and continues to receive substantial sums of money in royalties or commission splits from the brokerage operations of their respective subsidiaries, franchisees, and/or affiliates that transact business in the MetroList Counties.

110.    The Brokerage Defendants also have agreed to adopt, implement, and enforce NAR Section 2-G-1 by imposing NAR rules on their affiliated franchisees, brokers, and employees. By participating in an association which prevents members from allowing their associates to compete with one another for commissions, and by agreeing to follow and enforce these anticompetitive rules, the Brokerage Defendants joined the conspiracy and acted to further its implementation and enforcement.

111.    The Brokerage Defendants implemented the conspiracy by requiring and/or encouraging their contractors, agents, subsidiaries, and franchisees (and by necessary implication, the subsidiaries' and franchisees' agents and realtors) to comply with NAR's rules.

112.    Upon information and belief, franchise agreements between the Brokerage Defendants and their franchisees require those franchisees and their agents to: (a) comply with NAR's Code of Ethics; (b) join and comply with the rules of the local realtor association; and (c)

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

1 participate in and comply with the rules of the local MLS, which include the mandatory rules in

2 the NAR Handbook.

3      113.    Executives from the Brokerage Defendants actively participated in the management

4 and operation of NAR. For example, executives of franchisees and other affiliates of the Brokerage

5 Defendants dominated the 2018 eight-person Leadership Team that managed NAR's day-to-day

6 operations and the immediate past NAR President, Elizabeth Mendenhall, is the CEO of RE/MAX

7 Boone Realty in Columbia, Missouri.

8      114.    Both NAR's Handbook and in its Code of Ethics were drafted, developed, and

9 promulgated by the NAR Board of Directors or NAR's Professional Standards Committee. The

10 Brokerage Defendants use their leadership roles in NAR to implement the conspiracy by reviewing

11 NAR's Rules and agreeing to them at yearly meetings, and NAR further advances the conspiracy

12 by re-issuing its rules.

13      115.    Because of the Brokerage Defendants' agreements with their local franchisees and

14 agents, their employee policy and procedures manuals, the Brokerage Defendants' leadership roles

15 in NAR, and pressure from the Brokerage Defendants, local franchisees and agents located in the

16 MetroList Counties agreed to ensure that MetroList's rules contain the Anticompetitive Broker

17 Rules, which are the functional equivalents of NAR Section 2-G-1 and Standard Practice 16-16.

18      116.    Accordingly, the Defendants, along with co-conspirator NAR, have furthered and

19 participated in this agreement, combination, and conspiracy by adopting, implementing, and/or

20 enforcing the Anticompetitive Broker Rules.

21      **ANTICOMPETITIVE EFFECTS OF THE CONSPIRACY**

22      117.    Defendants' conspiracy has had the following anticompetitive effects throughout

23 the MetroList Counties:

24      (a)    Class Members paid inflated buyer broker commissions and inflated total

25            commissions.

26      (b)    Class Members were forced to pay commissions to buyer brokers, thereby

27            substantially inflating the cost of selling their homes.

28      (c)    Class Members were compelled to set a high buyer broker commission to

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

induce buyer brokers to show their homes to the buyer brokers' clients.

(d)   The retention of a buyer broker was severed from the setting of the broker's commission; the home buyer retained the buyer broker, while the home seller's agent sets the buyer broker's compensation.

(e)   Price competition among brokers to be retained by home buyers was restrained, as was price competition among brokers seeking to be retained to sell homes.

(f)   Competition among home buyers was restrained by their inability to lower buyer-broker commissions.

(g)   The Brokerage Defendants profited from inflated buyer-broker commissions and inflated total commissions.

118.   There are no pro-competitive effects of Defendants' conspiracy.

119.   Even if any alleged pro-competitive effects exist, they are substantially outweighed by the anticompetitive effects of Defendants' conspiracy.

120.   Economic evidence shows that Defendants' conspiracy has resulted in inflated total commissions and inflated buyer-broker commissions paid by Class Members, at levels above what would be paid in a competitive market.

121.   Economists Natalya Delcoure and Norm Miller compared international real estate commissions with those in the United States,[33] and concluded the following:

> Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand . . . . In the UK, the [total] commission rates average less than 2%. . . . In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%.[34]

They also found variation within countries. For example, in the UK, they found that "1%-2% is

---

[33]   *See* Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 Int'l Real Estate Review 12 (2002).

[34]   *Id*. at 14.

typical" for total broker commissions, but that in "very competitive areas" the total rates ranged between "0.5-0.75%" whereas in lower priced areas the range was "as high as 3.5%."[35] Ultimately, the economists concluded that, "based on global data, the [total] US residential brokerage fees should run closer to 3.0%."[36]

122.    In comparison, the total broker commissions (*i.e.*, the aggregate commission paid to the seller and buyer brokers) in the MetroList Counties average between 5% and 6%, with buyer broker commissions by themselves holding steady in a range between 2.5% and 3%. These numbers have remained stable despite both rising home prices and the decreasing role of the buyer broker during a time when many prospective home buyers have already scoured the market through online real estate marketplaces.

123.    Rule 7.13 encourages and facilitates anticompetitive steering away from brokers who deviate from the standard commission practices and rates. It enables buyer brokers to identify and compare the buyer-broker compensation offered by every seller and then steer their clients toward homes offering higher commissions.

124.    As confirmed by economic studies and literature, steering has clear anticompetitive effects. Steering deters reductions from the standard commission and enables brokers to avoid doing business with, or to retaliate against, buyer brokers who try to compete by offering significant discounts.

125.    Defendants have further exacerbated the anticompetitive effects of steering by implementing the requirement that buyer broker commissions be specified in only certain ways (*i.e.*, a percentage of the sale price), which makes it easy for individual realtors or agents to see and compare offers.

126.    The economic evidence demonstrates that Defendants' conduct operates to restrain competition in several respects in real estate markets with the result being that home sellers pay far more than they otherwise would in a competitive market.

---

[35] *Id*. at 17.

[36] *Id*. at 13.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

127. Defendants' conspiracy was designed to raise and maintain real estate commissions at elevated and supra-competitive levels. Defendants provided uniform training to seller brokers to obtain commission rates, on average, in the 5% to 6% range, and to split commissions roughly equally with buyer brokers. Because these commission offers are blanket offers and agreed to prior to listing the house, buyer brokers receive the same amount in commission regardless of the effort made, stifling competition.

128. Despite significant changes in technology that should have substantially reduced commission charges, Defendants have managed to keep the standard real estate commission stabilized at around, on average, 5% to 6% throughout the Class Period.

## **MARKET POWER AND GEOGRAPHIC SCOPE OF METROLIST**

129. Although MLSs exist throughout the United States, access to MetroList is critical for brokers to represent home buyers and sellers in connection with the sale and purchase of homes in the MetroList Counties.

130. Most homes sold in the MetroList Counties were listed on MetroList by brokers that are subject to MetroList's rules and regulations. MetroList is the largest Northern California MLS that "provides real estate professionals with detailed and accurate listing data, the most advanced technology, and first-in-class service to ensure … their clients have the best information available when making decisions to sell or purchase real estate."[37]

131. Collectively, MetroList and Brokerage Defendants provide a significant portion of the residential real estate broker services in these areas.

132. Any buyer broker in the MetroList Counties who wishes to compete outside of Defendants' conspiracy would face insurmountable barriers. Non-conspiring brokers would need to establish an alternative listing service to compete with the conspiring brokers, or alternatively, attempt to compete without access to a listing service.

133. A seller's broker without access to MetroList would be unable to reach most potential buyers, and a broker who represented a buyer without using a listing service would lose

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

---

[37] MetroList®, About Us, *available at* https://www.metrolist.com/about-us

access to most sellers. Brokers cannot compete effectively without access to an MLS and it is in the client's best interest to market a property on an MLS, subjecting it to the anticompetitive rules.

134.     For an alternative listing service to compete effectively with MetroList, it would need to have listings as comprehensive, or at least nearly so, as MetroList. However, brokers and their individual realtors or agents who currently profit from inflated buyer broker commissions and total commissions have minimal incentive to participate on an alternative listing service that would generate lower total commissions and lower buyer broker commissions and seller broker commissions. Furthermore, many buyers would be reluctant to retain a buyer broker operating on an alternative listing service that required them to pay the buyer broker commission, when other buyer brokers operating on MetroList are entirely compensated by home sellers. Accordingly, seller brokers on an alternative listing service would struggle to attract buyer brokers and their buyer clients.

135.     Moreover, many home sellers would not retain brokers using a new and unfamiliar alternative listing service that had no track record of success and had failed to attract sufficient buyers and buyer brokers. Any listing service attempting to compete with MetroList would likely fail to attract enough property listings to operate profitably and be competitive. The absence of listing services that compete with MetroList reflects the very substantial barriers to entry.

**CONTINUOUS ACCRUAL**

136.     During the Class Period, the Defendants repeatedly charged buyer-broker commissions and total commissions that were inflated because of the conspiracy. These inflated commissions were paid by Plaintiff and Class Members in connection with the sale of residential real estate listed on MetroList, in the MetroList Counties. Each payment of these inflated commissions by Plaintiff and the other Class Members injured them and gave rise to a new cause of action for that injury.

137.     During the Class Period, the Defendants have maintained, implemented, and enforced the conspiracy in the MetroList Counties.

**CLASS ACTION ALLEGATIONS**

138.     Plaintiff brings this action individually and on behalf of all others similarly situated,

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

and as a class action under Federal Rule of Civil Procedure 23(b)(2) and (b)(3), on behalf of members of the following Class ("the Class"):

> All persons and entities in the United States who, from January 18, 2020, paid a buyer broker commission in connection with the sale of residential real estate listed on the MetroList MLS.

139.    Excluded from the Class are Defendants, their officers, directors, and employees; any entity in which Defendant has a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Class are any judicial officer(s) presiding over this action and the members of his/her/their immediate family and judicial staff, jurors, and Plaintiffs' counsel and employees of their law firms.

140.    *Numerosity*. The members of the Class are so numerous as to render their individual joinder impracticable. Although the precise number of Class Members is unknown, based upon information and belief Plaintiff alleges that the Class contains thousands of members. The true number of Class Members is known by Defendants, however, and, thus, may be notified of the pendency of this action through electronic mail, first class mail and/or by published notice.

141.    *Adequacy of Representation*. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has retained trial counsel highly experienced in complex litigation including complex antitrust class action litigation, and Plaintiff intends to vigorously prosecute this action. Plaintiff has no interest in this action that is adverse or antagonistic to the interests of the Class.

142.    ***Existence and Predominance of Common Questions of Law and Fact.*** Common questions of law and fact exist as to all members of the Class and predominate over any question affecting only individual Class Members. These common legal and factual questions, each of which also may be certified under Rule 23(c)(4), include but are not limited to the following:

(a)    Whether the Defendants knowingly participated in the conspiracy;

(b)    Whether Defendants' conspiracy caused Plaintiff and Class Members to pay inflated commissions;

(c)    Whether Plaintiff and Class Members were injured as a result of Defendants'

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

1    anticompetitive conduct;

2    (d)    Whether Defendants' anticompetitive conduct was a material cause of

3    Plaintiff's and Class Members' injuries;

4    (e)    Whether the injury can be measured using evidence common to the Class;

5    (f)    Whether the competitive harm from the conspiracy substantially outweighs

6    any competitive benefits;

7    (g)    Whether Defendants' conduct violates the UCL; and

8    (h)    Whether Plaintiff and Class Members are entitled to restitution and/or

9    injunctive relief.

10    143.    ***Typicality***. Plaintiff's claims are typical of the claims of the members of the Class

11    because their claims arise from the same course of conduct by Defendants and the relief sought

12    within the Class is common to each member.

13    144.    ***Superiority***. A class action is superior to other available methods for the fair and

14    efficient adjudication of this controversy. The prosecution of separate actions by individual

15    members of the Class would impose heavy burdens on the Court and Defendants and would create

16    a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.

17    A class action, on the other hand, would achieve substantial economies of time, effort, and expense,

18    and would assure uniformity of decision as to persons similarly situated without sacrificing

19    procedural fairness or bringing about other undesirable results. Absent a class action, it would not

20    be feasible for the members of the Class to seek redress for the violations of law alleged herein.

21    145.    Furthermore, the Class may be certified under Rule 23 (b)(2) because Defendants

22    acted or refused to act on grounds generally applicable to the Class, thereby making appropriate

23    final and injunctive relief with respect to the Class as a whole.

24    <u>**ANTITRUST INJURY**</u>

25    146.    By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have

26    sustained injury to their businesses or property, having paid buyer broker commissions and thus

27    higher total commissions than they would have paid in the absence of Defendants' anticompetitive

28    conduct, and as a result have suffered damages.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

147.    There are no pro-competitive effects of Defendants' conduct that are not substantially outweighed by the anticompetitive effects.

148.    Economic evidence supports the conclusion that Defendants' anticompetitive conduct has resulted in Class Members paying buyer-broker commissions and total commissions that have been inflated to supra-competitive levels above what they would be in a competitive market.

149.    Defendants' conduct was a material cause of the injuries sustained by Plaintiff and Class Members.

150.    The injuries sustained by Plaintiff and Class Members as a result of Defendants' conduct are injuries of the type that the antitrust laws were intended to prevent.

### **FIRST CAUSE OF ACTION**

**Violation of Section 1 of the Sherman Act
15 U.S.C. § 1**

151.    Plaintiff repeats and incorporates by reference each paragraph above as if set forth in full herein.

152.    The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace.

153.    Defendants engaged and are engaging in a contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

154.    By adopting and implementing rules and regulations that require Class Members to make a blanket, unilateral offers of buyer broker compensation when listing a property on MetroList, Defendants unlawfully restrain trade by:

(a)     requiring Class Members to pay buyer-broker commissions, a cost that, in a competitive market, would be paid by the buyer;

(b)     preventing a buyer from seeking to reduce his, her, or their broker's commission by making that reduction a condition of a purchase offer; and

(c)     causing Class Members to pay inflated commissions.

155.    The conspiracy alleged herein consists of a continuing agreement or understanding among Defendants to adopt, implement, and enforce rules and regulations for any realtor who lists a property for sale on MetroList. These rules require all Class Members to agree to make a blanket, unilateral offer of buyer broker compensation when listing a property on MetroList:

(a)    Rule 7.13 forces Class Members to pay buyer-broker commissions, a cost that, in a competitive market, would be paid by the buyer.

(b)    Rule 9.5 prevents a buyer from seeking to reduce his, her, or their broker's commission by making that reduction a condition of a purchase offer.

(c)    The Defendants restrain trade by enforcing policies and practices that artificially inflate commission rates.

156.    Defendants have restrained competition in the MetroList Counties by adopting rules that require Class Members to pay: (1) buyer-broker commissions, (2) inflated buyer-broker commissions, and (3) inflated total commissions. This harm to competition substantially outweighs any competitive benefits from the conspiracy.

157.    Defendants' unlawful restraint affects interstate commerce because certain of the Defendants who are participating in and profiting from the conspiracy are located outside of the State of California.

158.    Defendants' conspiracy has caused buyer-broker commissions and total commissions in MetroList Counties to be higher than they would have been but for the conspiracy. Plaintiff and the other members of the Class paid these inflated commissions in connection with the sale of residential real estate listed on MetroList in the MetroList Counties. Absent Defendants' conspiracy, Plaintiff and the Class Members would have paid lower commissions.

159.    Defendants' agreement to restrain trade is a *per se* violation of Section 1 of the Sherman Act.

160.    As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiff and the Class Members have been injured in their business or property in an amount to be proven at trial.

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

## SECOND CAUSE OF ACTION

### Violation of the Cartwright Act
### California Business & Professions Code §§ 16720 *et. seq.*

161.    Plaintiff repeats and incorporates by reference each paragraph above as if set forth in full herein.

162.    Defendants have engaged in conduct that was and continues to be an unreasonable restraint of trade or commerce in violation of the Cartwright Act, California Business and Professions Code §§ 16720 *et. seq.*

163.    By adopting and implementing rules and regulations that require Class Members to make a blanket, unilateral offer of buyer-broker compensation when listing a property on MetroList, Defendants unlawfully restrain trade by:

        (a)    requiring Class Members to pay a cost that, in a competitive market, would be paid by the buyer;

        (b)    preventing a buyer from seeking to reduce his, her, or their broker's commission by making that reduction a condition of a purchase offer; and

        (c)    causing Class Members to pay inflated commissions.

164.    Defendants have unlawfully restrained competition in MetroList Counties by adopting rules that require Class Members to pay: (1) buyer-broker commissions, (2) inflated buyer-broker commissions, and (3) inflated total commissions. Defendants' anticompetitive conduct constitutes a *per se* violation of California's antitrust law and is, in any event, an unreasonable and unlawful restraint of trade. The anticompetitive effects of Defendants' conduct far outweigh any purported non-pretextual, procompetitive justifications.

165.    Defendants' conspiracy has required Class Members to pay buyer-brokers, to pay inflated buyer-broker commissions and inflated total commissions and has restrained price competition among buyer-brokers in MetroList Counties. This harm to competition substantially outweighs any competitive benefits from the conspiracy.

166.    Defendants' unlawful restraint of trade has caused and continues to cause buyer-broker commissions and total commissions paid by Class Members to be higher than they would

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

have been but for the conspiracy, and thus substantially affects California commerce. Plaintiff and Class Members paid these inflated commissions in connection with the sale of residential real estate listed on MetroList.

167.     Plaintiff and Class Members have suffered injury in fact and lost money because of Defendants violations of law and wrongful conduct, for which they seek damages (trebled where appropriate) including pre-judgment interest.

168.     Defendants' conduct is continuing and unless equitable relief is granted, artificially and anticompetitively inflated commission rates will continue unabated and cause harm.

### THIRD CAUSE OF ACTION

**Violation of California's Unfair Competition Law**
**California Business and Professions Code §§ 17200, *et seq.***

169.     Plaintiff repeats and incorporates by reference each paragraph above as if set forth in full herein.

170.     Defendants' conduct constitutes unlawful and unfair business acts and practices within the meaning of California's Unfair Competition Law, California Business and Professions Code §§ 17200 *et. seq.* ("UCL").

171.     The UCL prohibits "any unlawful, unfair or fraudulent business act or practice…" Cal. Bus. & Prof. Code § 17200.

172.     Defendants' acts or practices are unlawful because they violate, *inter alia*, the Sherman Antitrust Act and the California Cartwright Act.

173.     Defendants' acts and practices are unfair in that: (i) they are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers; (ii) they harmed and continue to harm consumers in a manner far outweighing any legitimate utility of their conduct; (iii) the injury was not one that consumers reasonably could have avoided; and (iv) they were contrary to legislatively declared and public policy.

174.     Defendants financially benefited from their conduct to the financial detriment of Plaintiff and Class Members.

175.     As a direct and proximate result of Defendants' unlawful and unfair acts and

1  practices, Plaintiff and Class Members suffered substantial injury in fact, and lost money and/or

2  property. The injuries suffered by the Plaintiff and Class Members include, but are not limited to,

3  paying buyer-broker commissions and higher total commissions than they would have paid in the

4  absence of Defendants' anticompetitive conspiracy.

5  176.   Defendants' conduct is continuing and unless injunctive relief is granted, artificially

6  and anticompetitively inflated commission rates will continue unabated.

7  177.   Defendants thus have engaged in unlawful and unfair business acts and practices in

8  violation of the UCL, entitling Plaintiff and Class Members to judgment and relief against

9  Defendants as set forth in the Prayer for Relief.

10  **FOURTH CAUSE OF ACTION**

11  **Unjust enrichment**

12  178.   Plaintiff repeats and incorporates by reference each paragraph above as if set forth

13  in full herein.

14  179.   To the extent required, this claim is pleaded in the alternative to the other claims in

15  this Complaint.

16  180.   Defendants have reaped and retained substantially higher profits due to their

17  unlawful agreements and scheme.

18  181.   Plaintiff and Class Members have conferred and continue to confer an economic

19  benefit upon Defendants in the form of profits resulting from the unlawful overcharges from real

20  estate commissions by adopting and implementing rules and regulations that require Class

21  Members to make a blanket, unilateral offer of buyer broker compensation when listing a property

22  on MetroList, as described herein, to the economic detriment of Plaintiff and Class Members.

23  182.   Defendants' financial gain from their unlawful conduct is traceable to overpayments

24  by Plaintiff and Class Members for real estate broker commissions.

25  183.   Defendants have benefited from their unlawful acts, and there is no legal basis for

26  Defendants to be permitted to retain any of the ill-gotten gains resulting from overpayments made

27  by Plaintiff and Class Members for real estate broker commissions during the Class Period.

28  184.   The financial benefits the Defendants derived from overcharging Plaintiff and Class

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

1   Members is a direct and proximate result of Defendants' unlawful practices described herein.

2       185.    The financial benefits Defendants derived are ill-gotten gains that rightfully belong

3   to Plaintiff and Class Members who paid, and continue to pay, artificially inflated broker

4   commissions that inure to Defendants' benefit.

5                                   **PRAYER FOR RELIEF**

6       **WHEREFORE**, Plaintiff, individually and on behalf of members of the Class, requests

7   relief and prays for judgment against Defendants as follows:

8   (a)    An Order certifying the Class under the appropriate provisions of Rule 23 (b)(2)

9          and (b)(3) of the Federal Rule of Civil Procedure;

10  (b)    An Order appointing Plaintiff as the Class representative and appointing her

11         counsel as Class Counsel;

12  (c)    Declarations that the actions of Defendants, as set forth above, are unlawful and in

13         violation of the Sherman Act, the Cartwright Act, and the UCL;

14  (d)    An award to Plaintiff and the Class Members for actual damages trebled in an

15         amount to be determined at trial;

16  (e)    A permanent injunction under Section 16 of the Clayton Act enjoining Defendants

17         from (1) requiring that sellers pay the buyer broker, (2) continuing to restrict

18         competition among buyer brokers and seller brokers, and (3) engaging in any

19         conduct determined to be unlawful;

20  (f)    Appropriate injunctive relief under the UCL;

21  (g)    For restitution and restitutionary disgorgement of all monies wrongfully obtained

22         from Plaintiff and the Class by Defendants;

23  (h)    An award to Plaintiff and the Class Members of pre- and post-judgment interest;

24  (i)    An award to Plaintiff and the Class Members for their costs of suit, including

25         reasonable attorneys' fees and expenses; and

26  (j)    An award of such other relief as the Court may deem just and proper.

27

28

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111

## **DEMAND FOR JURY TRIAL**

Plaintiff, on behalf of herself and all others similarly situated, hereby demands a jury trial of all issues so triable.

DATED:  January 18, 2024                    **PEARSON WARSHAW, LLP**

By:          */s/ Jill M. Manning*

JILL M. MANNING (Bar No. 178849)
jmanning@pwfirm.com
**PEARSON WARSHAW, LLP**
555 Montgomery St., Suite 1205
San Francisco, California 94111
Telephone: (415) 433-9000

DANIEL L. WARSHAW (Bar No. 185365)
dwarshaw@pwfirm.com
BOBBY POUYA (Bar No. 245527)
bpouya@pwfirm.com
NAVEED ABAIE (Bar No. 323338)
nabaie@pwfirm.com
ERIC J. MONT (Bar No. 319592)
emont@pwfirm.com
**PEARSON WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300

DOUGLAS MILLEN (*Pro Hac Vice* Forthcoming)
dmillen@fklmlaw.com
ROBERT WOZNIAK (*Pro Hac Vice* Forthcoming)
rwozniak@fklmlaw.com
MATTHEW RUAN (Bar No. 264409)
mruan@fklmlaw.com
**FREED KANNER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL  60069
Telephone:  (224) 632-4500

*Attorneys for Plaintiff and the Proposed Class*

PEARSON WARSHAW, LLP
555 MONTGOMERY STREET, SUITE 1205
SAN FRANCISCO, CALIFORNIA 94111